# Watson & Company *v.* Lenz.

*Judgment—Validity of judgment—Evidence—Question for jury.*

In an action by the vendors of personal property who had rescinded the sale, against the sheriff and an execution creditor for an alleged wrongful sheriff's sale of the goods, where the issue is the validity of the judgment under which the sheriff's sale was made, the Supreme Court will not reverse a verdict and judgment for defendants, if it appears that the evidence, although contradictory in character, tended to show that the debt represented by the judgment was contracted after the goods went into the possession of the defendant in the execution, and that the judgment was confessed without any fraudulent intent.

Argued Oct. 29, 1900. Appeal, No. 151, Oct. T., 1900, by plaintiffs, from judgment of C. P. No. 2, Allegheny Co., Jan. T., 1897, No. 515, on verdict for defendants in case of W. G. Watson & Company v. Henry Lenz and James F. Richards, sheriff. Before McCollum, C. J., Mitchell, Fell, Brown, Mestrezat and Potter, JJ. Affirmed.

Trespass for an alleged wrongful sheriff's sale of lumber. Before Shafer, J.

The facts appear by the charge of the court which was as follows :

This is an action by W. G. Watson & Company, who are lumber dealers, against Henry Lenz and Mr. Richards, the former sheriff of the county. The cause of action is alleged to be that Mr. Lenz was the plaintiff in an execution which was issued to the sheriff, and that the sheriff sold on that execution certain lumber which honestly and in equity belonged to the plaintiff, W. G. Watson & Company.

It seems that a firm called George Loeffert & Sons was in the lumber business in Sharpsburg, and I believe it is stated here, whether it is in evidence or not, that the business was principally carried on by John Loeffert, the son of George Loeffert, and one of the members of that firm, and that he gave out false statements to the lumber trade about their business and assets, and by means of these representations procured people to give him credit and sell him lumber who otherwise would

not have sold him lumber, and among others to whom he gave these statements was W. G. Watson & Company, and, to avoid going into that matter here, the parties agreed that the lumber of Watson & Company which was sold to Loeffert & Sons was sold under such circumstances and such misrepresentations that Watson & Company had a right to rescind their contract. You understand, gentlemen, that if one man is induced to sell another goods under some false pretense, and he delivers the goods, and they go into the hands of the person to whom he sells them, and he afterwards discovers some fraud, he may, if he chooses, rescind the sale and give back the money or notes, or whatever was paid, and claim the goods if they are still in the hands of the party to whom he sold them, and the circumstances have not been changed to the detriment of anybody else.

Now, in this case the plaintiff showed you by this admission that they had the right to rescind the contract for the sale of some $3,000 worth of lumber, I believe, which they had sold to Loeffert & Sons; at least they had the right as against Loeffert & Sons, and they showed that they gave notice to the sheriff and to Mr. Lenz not to sell that lumber, and that the sheriff did sell the lumber. That, of course, was a proper enough way in which to raise the question as to who really did own it. In the absence of any evidence to the contrary, that would, of course, make out a claim for the plaintiff and show that the lumber belonged to the plaintiff and should not have been sold by the sheriff.

[The defendants then opened up their case and proceeded to show that at least part of the judgment on which Mr. Lenz was selling out this lumber was for money or credit (it does not matter which) which he had advanced after this lumber came into the hands of Loeffert & Sons. If that were true, that would be a reason why he should still hold the lumber; because, while he does not undertake to say he knew that particular lumber, of course, or saw that particular lumber, yet if the lumber of Watson & Company was in the yard, in the possession of Loeffert & Son, and went to make up their apparent wealth, then, of course, he would have a right, as far as he was concerned, and as against Watson & Company, to claim that he had a prior right to it if he acted upon it. If Loeffert & Sons had already

incurred all the debt which they owed him on this judgment by that time, then he could not be heard, of course, and he could not claim the lumber was lawfully sold in his execution; but if a part of his debt, equal to or greater than the amount of lumber which Watson & Company had sold to them was in the yard at the time that debt was contracted—that part of the debt was contracted—then he would have a right to sell it, notwithstanding the claims of Watson & Company.] [1]

The plaintiff replies to that with the allegation that he could not be in the position of a bona fide purchaser of this lumber for value, because, they say, the whole judgment of Mr. Lenz against Loeffert & Sons was a fraud, and was part of a scheme to defraud the creditors of Loeffert & Sons and that the defendant denies. That, it seems to me, is practically the question in this case.

There is no denial of the evidence given on the part of Mr. Lenz that he indorsed to the amount of $8,800 for the firm of Loeffert & Sons on the same day or the day before he took the note for $47,000, and that at that time, and for a considerable time before that, the lumber was in the yard of Loeffert & Sons. There has been no evidence contrary to that, but there has been something said in argument as to the probability of it, because he did not ask John Loeffert, his son, anything about it. The allegation of Mr. Lenz, as I understand it, is that John Loeffert was his son-in-law, and that he understood from the Farmers' Deposit Bank that John Loeffert had induced them to discount $8,800 worth of notes that they believed to be fraudulent, or at least pretended to have been made for business paper when they were not made for business paper, and that they were going to prosecute his son-in-law, and that he, upon the request of Mr. Wakefield, who was attorney for Loeffert & Sons, long before he ever saw or heard of Mr. Lenz, as he said, and as Mr. Lenz said, that upon the request of Mr. Wakefield he did that, so that I cannot see, for my part, that whether he spoke to John in person about it or not, has any particular bearing upon the case.

Now, the plaintiff's contention is, as I understand it, that this $47,000 note, on which the judgment was entered and the execution issued, was a fraud. They do not deny that these Loefferts owed Mr. Lenz that amount of money, at least they

do not give any evidence to that effect, but they say that the Loefferts and Mr. Lenz before this time were in a scheme to cause this lumber yard to be sold out and to be bought in again in the name of Mr. Lenz, and that he would let the Loefferts carry it on. If you find that to be true, then I would say you would have to find a verdict for the plaintiff, because, in that case, I do not think this man could be said to be a bona fide purchaser for value if that is true, and that is, practically, the matter in issue here if I understand it.

Now, then, we have the testimony on that subject as stated by counsel. A fraud, of course, is a thing which people are not exposing to the public. It is hard to prove a fraud, because when people are getting up a fraud they do not tell about it, and therefore, as stated by counsel, it is a rule that we take sometimes a wide latitude and let in a great many things which might tend to show, if put together, whether there was fraud or not, and that is what you look at here.

Now, you start with the proposition that it is not denied, that these people owed Mr. Lenz, or that he was liable for them, and that is practically the same thing, and that they owed him this $47,000. It was alleged by one witness, who, for some reason, was not here, but whose testimony was read to you, the bookkeeper at Loeffert & Sons, that he used to go down to see Mr. Lenz with notes to get discounted. He went to Mr. Lenz's house, for Mr. Lenz did not live in this neighborhood, as I understand it, but in the city somewhere, and that when he was down there he would talk to Mr. Lenz about this arrangement for selling out this property; that there was going to be a big judgment entered, or something of that sort; I do not remember the exact words but something to that effect. Now that is denied by Mr. Lenz, and Mr. Lenz says that he did not know that he was on as much paper as he was, or did not know anything about the trouble with these people until Mr. Wakefield sent for him; and Mr. Wakefield tells you that as far as he knows Mr. Lenz did not know, or at least he says he did not know Mr. Lenz, and had no communication with him before July 20, the Sunday before this note was signed. You will recollect the testimony on that point. Now, that is a matter you will have to investigate for yourselves. Mr. Lenz says he did not have those conversations with Mr. Dice. Mr. Dice

also claims that Mr. Wakefield told him he had swelled these judgments to make the creditors lay down, etc. You will have to make up your minds which of them is telling the truth the best you can, and consider the probability whether such things would be told or not in that way.

There was also a witness by the name of Rhodes put on the stand. Mr. Rhodes tells you that he had paid in advance, or given notes in advance for an order he had with Loefferts, and when he found there was a sheriff's sale going on, he went up there to see what was going to happen to him, he having only gotten about one half his order. He says Wakefield and Lenz were together, and I do not know which of them said it, but it would not matter, if they were together, but he said one of them said that those orders would be filled. Mr. Wakefield told you that they said they would have those orders filled, that he found out from John Loeffert, who was there, that they had one note there yet, and if that would be turned over to Lenz they would fill the order. Now, it is argued here that it was improbable that Mr. Lenz would make a present to Mr. Rhodes of this. I think, myself, it is very improbable, but I do not really see what particular effect that has on the matter at all. The claim, as I understand it, of the plaintiff, is that that was a part of the proceedings to carry on the business afterwards ; but I cannot see how it would be. There was no reason one way or another that I can see for Mr. Lenz to agree to pay this whole debt. I do not see how that would help to carry on the business, or how it would hinder it, or what effect it had.

Then there was some testimony given here by Mr. Myers, who said that he actually talked to Mr. Lenz without knowing who he was at the time. Now, that is alleged to be a contradiction. It seems to me that a conversation like that—a few words like that—I can imagine a man who did not know another and at a sale spoken to by somebody, might afterwards say he didn't have such a conversation ; but the conversation, if I remember it rightly, is this, that Mr. Myers, being a creditor of this concern, and seeing things sold on a large judgment, was of course, feeling badly, and walking alongside of a stranger, he said, " This looks like fraud," and, of course, if Mr. Lenz heard that he would suppose that Mr. Myers knew who he was ; that he was a plaintiff in the judgment, and he would say,

" Fraud or not, I am going to sell it out or buy it in." For my part I cannot see very much in that one way or another. There is also testimony as to the fact, and it is a fact which is to be looked into by you, that this mill was run afterwards, and that to some extent, might corroborate Mr. Dice, or, at least, it might help to carry out the notion that this sale was gotten up beforehand, the fact that Mr. Lenz hired his son-in-law to carry on the business and let him carry it on. Now, he tells you he knew nothing about the business himself, and it is a question for you which state of facts it is consistent with. Lenz said, "I knew nothing about the business myself; I didn't know my son-in-law was such a rascal as he turned out to be, and I had this place on my hands and I therefore let him run it;" but whether it shows that Mr. Lenz was in the scheme to buy this out for the Loefferts, and in carrying out that scheme that he kept the Loefferts there, it is for you to decide. There was something said, too, about other judgments that were entered. That Loeffert & Sons confessed a judgment of $20,000, and another for $3,500, which afterwards were satisfied. You have heard the explanation of that. Now, while it is true that Mr. Wakefield was attorney for Lenz, it is also true that he was attorney for Loeffert, and it does not appear here that Lenz knew anything at all about those judgments; nor can I see how that would have any effect in preventing him from getting his money, or helping to get it, because he didn't have control of them, and I do not see that he had any more to do with that than the defendant had. Now, that, gentlemen, is practically the testimony as I understand it which bears on this subject of whether this was a fraudulent judgment or not.

If you are of opinion from all this evidence that this judgment was a fraudulent judgment, and that, even if the money was owing, it was done for the purpose of cheating and defrauding the creditors of Loeffert & Sons, then you will find a verdict for the plaintiff. [If you are not satisfied of that and if you find that this $7,000, for I believe one of these notes turned out to be good afterwards, but in this case there is no matter about it—if you find the $7,000 or $8,000 of this indebtedness contained in this note was contracted after this lumber was furnished, or was contracted, as the defendant says it was, at the same time that the note was given, then you will find a verdict

for the defendant.] [2] The attorneys have made a calculation of the amount which they send out with you. In this statement that is given to you, this being an action of trespass, there is nothing set down for interest. If you find for the plaintiff, you will find for this amount of lumber and you can make an allowance for the time that has elapsed, by way of compensation for that length of time, and that may make a sum equal to interest, perhaps, if you find a verdict for the plaintiff.

Verdict and judgment for defendants. Plaintiffs appealed.

*Errors assigned* among others were (1, 2) above instructions quoting them.

*R. B. Ivory*, with him *W. B. Rodgers*, for appellant.—As to the $8,883, part of the judgment, in so far as our lumber is involved, Lenz did not occupy a position analogous to that of a bona fide purchaser for value without notice, and therefore our rights to rescind and reclaim our lumber were not affected by his execution: Wait on Fraudulent Conveyances, 502; Hough v. Dickinson, 58 Mich. 89; Pringle v. Phillips, 5 Sandford, 173; Levy v. Cooke, 143 Pa. 614; May v. Walter, 56 N. Y. 11; Schwartz v. McCloskey, 156 Pa. 258; Hussey v. Thornton, 4 Mass. 405; Smith v. Denmie, 23 Mass. 266.

*D. F. Patterson*, with him *J. A. Wakefield*, for appellees, cited: Schwartz v. McCloskey, 156 Pa. 258.

PER CURIAM, January 7, 1901:

This was an action of trespass which resulted in a verdict for the defendants and on which a judgment was entered. The plaintiffs being dissatisfied with the result appealed to this court. They filed with the record three assignments of error, two of which were based on excerpts from the charge, and one on the testimony of Wakefield. An examination of the ground on which the respective assignments are predicated does not disclose any cause for the reversal of the judgment. The charge of the court, as a whole, appears to have been fair, and the rulings upon the admission or rejection of evidence unobjectionable. We therefore dismiss all the assignments.

Judgment affirmed.